IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| GUSTAV A. LITTLE, | ) | 8:14CV138 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff brings this suit to challenge the Social Security Commissioner's final administrative decision denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.[1]  For the reasons discussed below, the Commissioner's decision will be affirmed.

## I. PROCEDURAL BACKGROUND

Plaintiff applied for SSI on January 24, 2011, when he was 55-years old, and claimed a disability onset date of September 17, 2008  (Transcript ("Tr.") 176-185).[2] Plaintiff complained of arthritis in his wrists, carpal tunnel syndrome, COPD, gout, back pain, macular degeneration, and depression (Tr. 180).

The application was denied initially on April 22, 2011 (Tr. 60-61, 64-67), and upon reconsideration on September 30, 2011 (Tr. 62-63, 71-74). Following these denials, Plaintiff requested an administrative hearing (Tr. 75).

---

[1] Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g), 1383(c)(3), provide for judicial review of the Commissioner's final administrative decisions under Title XVI.

[2] The transcript (administrative record) is docketed as Filing Nos. 11 and 12.

Timothy Belford, an administrative law judge ("ALJ"), conducted a video hearing on February 22, 2013 (Tr. 32-59). Plaintiff was represented by counsel and testified at the hearing.  Testimony was also provided by a vocational expert. The ALJ issued an unfavorable decision on April 26, 2013 (Tr. 12-26).

Using the 5-step sequential analysis prescribed by Social Security regulations,[3] the ALJ made the following findings:

> 1. The claimant has not engaged in substantial gainful activity since January 24, 2011, the application date (20 CFR 416.971 *et seq.*).

> 2. The claimant has the following severe impairments: arthritis of the wrists; carpal tunnel syndrome; degenerative disc disease; chronic constructive pulmonary disease (COPD); gout; diabetes mellitus type II; depression, and alcohol abuse in remission (20 CFR 416.920(c)).

> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the

---

[3]  The Eighth Circuit has described the procedure as follows:

> At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity ("RFC")] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (footnote omitted).

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(b) with the following limitations: he could occasionally crawl; he could frequently handle and finger; he must avoid exposure to extreme temperature changes; he must avoid concentrated exposure to pulmonary irritants such fumes, odors, dust, gases, and poorly ventilated areas; work is limited to routine tasks with no detailed instructions; and he is limited to only occasional interaction with coworkers and the general public.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on May 9, 1955 and was 55 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed(20 CFR  416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since January 24, 2011, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-25).

On June 4, 2013, Plaintiff requested review of the ALJ's decision by the Appeals Council of the Social Security Administration (Tr. 7-11). The request for

review was denied on April 2, 2014 (Tr. 1-6). The ALJ's decision thereupon became the final decision of the Commissioner. *See Van Vickle v. Astrue,* 539 F.3d 825, 828 (8th Cir. 2008). Plaintiff filed this action on May 2, 2014 (Filing No. 1).

## II. ISSUES

Plaintiff argues the ALJ's decision should be reversed, and the case remanded, because (1) the ALJ did not order a consultative physical examination; (2) the ALJ's assessment of Plaintiff's residual functional capacity, which relied on the opinions of non-examining physicians, does not comply with *Nevland v. Apfel,* 204 F.3d 853 (8th Cir. 2000); and (3) the vocational expert's opinion does not support a finding that Plaintiff is not disabled. In response, the Commissioner argues that (1) the record contained sufficient evidence for the ALJ to determine Plaintiff's physical abilities without a consultative exam; (2) *Nevland* is inapposite; and (3) any errors in the vocational expert's testimony are harmless.

## III. MEDICAL HISTORY

The medical evidence includes 705 pages of treatment records from the Veterans Administration Medical Center (VAMC) in Hot Springs, South Dakota, covering a period of 12½ years, from May 15, 2000, to December 13, 2012 (Tr. 259-964). The bulk of this evidence reports addiction treatment. In addition, the record contains reports of two consultative psychological examinations that were conducted at the request of the Commissioner on January 9, 2009, and March 31, 2011 (Tr. 209-14, 254-58).[4]

---

[4] The first consultative psychological examination took place because of an earlier application for SSI benefits that was filed by Plaintiff on September 17, 2008, and denied by the Commissioner on January 29, 2009 (Tr. 122). While the relevant time period begins with the date of the SSI benefits application on January 24, 2011, rather than the alleged disability onset date of September 17, 2008, *see* 20 C.F.R. § 416.335 ("[T]he earliest month for which we can pay you [SSI] benefits is the month

On January 9, 2009, Plaintiff underwent a consultative mental examination with Suzanne Halfen, Psy.D. (Tr. 209-14). Dr. Halfen found that Plaintiff was oriented and fully able to participate in the evaluation (Tr. 213). Plaintiff had congruent mood and effect with no indications of thought disorder (Tr. 213). She found that Plaintiff's mental processing was surprisingly fast, and that he had good immediate and long-term recall (Tr. 213). Plaintiff's weakest area was abstraction, but he had average insight and judgment and "quite good" arithmetic skills and fund of knowledge (Tr. 213). She observed that he had deficits of adaptive functioning, specifically occasional lack of energy and great difficulty with social functioning, but that he could sustain concentration and attention when not drinking and in the absence of conflict (Tr. 213). Plaintiff could remember short and simple instructions, but often needed a task demonstration (Tr. 213). Plaintiff could also appropriately relate to supervisors and coworkers (Tr. 213).

On July 29, 2009, Plaintiff had a mental status exam in connection with his readmission to a residential rehabilitation treatment program with the Department of Veterans Affairs (VA).  Plaintiff was oriented, had fair judgment and insight, and was well groomed with good hygiene (Tr. 507). Plaintiff had a full range affect, logical and sequential thought process, and a cooperative attitude (Tr. 507). Psychologist Andrew Q. Tran, M.D., continued Plaintiff's medications and ordered a one-month follow up (Tr. 508). A nursing assessment the following day revealed that Plaintiff walked every day for exercise and was capable of walking on ramps and stairs (Tr.

---

following the month you filed the application."), any of Plaintiff's medical records that relate to his alleged impairments may be considered. In fact, the Commissioner was required to consider at least 12 months of records. *See* 20 C.F.R. § 416.912(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application.").

505). Plaintiff also reported a desire to participate in incentive therapy and compensated work therapy (CWT) (Tr. 502).

During a family and social assessment on August 4, 2009, Plaintiff stated that he had been working for five years on a ranch (Tr. 498). Psychologist Daniel Trujillo assessed Plaintiff's strengths as some work history, and observed that Plaintiff remained physically active and could perform activities of daily living and "still work, enjoys arts, crafts and leather work" (Tr. 497). Another psychological assessment the same day showed that Plaintiff's serious anxiety was a direct result of drugs and alcohol use (Tr. 494). Except for a little difficulty with short-term memory in the past year, Plaintiff reported no trouble with understanding, concentration, or memory (Tr. 494). Plaintiff said that he only experienced loss of interest and pleasure in normal life during times of excessive daily use of cannabis and alcohol (Tr. 494). The mental status examination showed that Plaintiff was cooperative, with some short-term difficulty with forgetfulness, but concrete thought processes, normal mood, and fair judgment and insight (Tr. 495).

On August 12, 2009, Plaintiff reaffirmed his ability and interest to work and enter the CWT program (Tr. 482). On August 18, 2009, Plaintiff underwent a routine mental status examination and had logical, sequential, and goal-oriented thoughts (Tr. 477-78). His judgment and insight were fair, and he was fully oriented (Tr. 478). A routine treatment note from August 27, 2009, shows that Plaintiff was working on a truck and making ceramics in his spare time (Tr. 474).

On September 15, 2009, Plaintiff was approved for work with no restrictions (Tr. 464). A nurse practitioner at the VAMC determined that Plaintiff was capable of lifting 50 pounds, performing occupational bending, standing for two hours, working an eight-hour shift, operating hand tools or equipment, and negotiating stairs (Tr. 463). Plaintiff was found 'mentally and physically capable of operating woodshop power tools: table saw, jig saw, jointer, radial arm saw, router, drill press, disc and belt

sanders, band saw, portable power tools, grinder, riding mower, push mower, weed eater, lawn sweeper, hand blower, Bobcat, snow blower" (Tr. 463).

On September 17, 2009, Plaintiff reported that "work is going well," despite also reporting feelings of depression, hopelessness, and worthlessness (Tr. 461). On October 8, 2009, Plaintiff said that his employer was pleased with his work (Tr. 457). Plaintiff's follow up reports consistently showed largely normal mental status examination results and effective medications. For example, on December 2, 2009, Plaintiff reported that his sleep and mood were better since beginning Sertraline (Tr. 447), and that Trazodone helped his sleep with no side effects from either medication (Tr. 447).

On February 10, 2010, Plaintiff underwent an exercise stress test but stopped after 7 minutes because of dypsnea (shortness of breath) and leg fatigue (Tr. 307). The exam was negative, with no exercise induced ischemia or significant arrhytmias seen, but was limited by Plaintiff's decreased exercise tolerance (Tr. 307).

On March 2, 2010, Plaintiff had an audiology exam after reporting a ringing in his ears and difficulty hearing (Tr. 301-304). Hearing thresholds and tympanometry results were established within normal hearing limits, bilaterally, suggesting normal hearing status and normal middle ear status for both ears (Tr. 303).

On May 7, 2010, Plaintiff reported to a nurse practitioner, James Woehl, that he had injured his lower back while lifting a heavy weight (Tr. 295). On examination, Plaintiff had point tenderness to his lumbar spine at approximately L1, but full range of motion; he was he able to walk, but had some difficulty getting up (Tr. 296). Plaintiff also reported some knee pain from hyperextending his right knee while walking across a field (Tr. 296). In addition, Plaintiff reported increasing numbness in his hands, which Mr. Woehl stated "could very well be early neuropathy" (Tr. 295). Lumbar spine x-rays to help assess 'radicular pain to the low back" revealed mild calcification in the abdominal aorta and minimal scoliosis, minimal marginal spurs at

L2-3 through L5-S1, and mild facet degenerative changes at L4-L5 and L5-S1 (Tr. 259). Cervical spine x-rays to help assess "radicular pain to the hands" revealed mild calcific atherosclerotic disease of the carotid bifurcations bilaterally, slight straightening of the cervical spine, mild narrowing of C5-6 and C6-6 disc spaces and mild marginal spurs at these levels (Tr. 260).

On December 22, 2010, Philip McRill, M.D., evaluated Plaintiff's complaint of increasing pain in both wrists. On exam,

> Hands show tenderness to palpation of thumb saddle joints and pain with active ROM of same joints. Wrists are tender to palpation. Phalen's and Tinel's signs are positive. There is no thenar [muscle] wasting.[5]

(Tr. 278). Dr. McRill assessed bilateral carpal tunnel syndrome and arthritis of the first digit carpometacarpal joint. He ordered bilateral thumb spica splints for Plaintiff to wear at night. It was noted that Plaintiff "has a simple wrist support that he can wear at work during the day because he is to wear gloves and cannot wear any other sort of CTS splint or thumb spica" (Tr. 278).

On March 22, 2011, Plaintiff was examined by an optometrist (Tr. 335-337). No diabetic retinopathy was noted (Tr. 336). New glasses were ordered to correct nearsightedness (Tr. 337).

On March 31, 2011, Dr. Halfen conducted a second consultative mental examination (Tr. 254-58). Plaintiff was fully oriented and had unimpaired memory (Tr. 257). Plaintiff had a decreased ability to focus, but had congruent mood and affect (Tr. 257). Dr. Halfen opined that Plaintiff could still perform his activities of daily living, so long as someone else covered the basics, such as a place to live (Tr. 257). She believed that Plaintiff was unlikely to be able to sustain appropriate relationships

---

[5] Phalen's and Tinel's signs are tests for carpal tunnel syndrome.

with supervisors or peers, but could learn simple tasks and carry them out under ordinary supervision (Tr. 257-58).[6]

Plaintiff received admission for residential rehabilitation with a VA clinic on July 12, 2011 (Tr. 397). He denied joint pain, swelling, bone pain, morning stiffness, and joint deformities (Tr. 402). Plaintiff reported early morning stiffness of the metacarpophalangeal joint, but reported that Tylenol helped his symptoms (Tr. 402). Physical examination showed that he had an unremarkable station and coordination, a stable gait, and no abnormal movements (Tr. 403). Plaintiff had symmetrical muscle strength against resistance, no range of motion deficits, and normal sensory function (Tr. 403). Mentally, Plaintiff was oriented, logical, alert, and cooperative (Tr. 403).

On July 13, 2011, a mental status examination (Tr. 357-63) showed that Plaintiff had good concentration, goal-directed thoughts, intact insight and judgment, and "OK" memory (Tr. 362). Plaintiff reported that he was good at ranch work (Tr. 363). An evaluation for CWT eligibility noted that Plaintiff was capable of lifting 30 pounds, performing occupational bending, and tolerating repetitive motions (Tr. 367). A physical examination found that Plaintiff could ambulate independently with unremarkable station and coordination (Tr. 387). He had no abnormalities of gait and had symmetrical muscle strength against resistance (Tr. 387). Plaintiff was oriented, appropriately dressed, and had intact cognition (Tr. 387). Plaintiff also underwent diagnostic imaging of both knees, which revealed minimal to mild narrowing of the medial knee joint compartment (Tr. 392).

---

[6] Patricia Newman, Ph.D., completed an assessment of Plaintiff's mental abilities on April 18, 2011 (Tr. 215-17). Dr. Newman opined that Plaintiff was markedly limited in his ability to understand, remember, and carry out detailed instructions (Tr. 215). Plaintiff had no other marked limitations but had various other moderate limitations (Tr. 215-16). On September 28, 2011, state agency consultant Demetri Dres affirmed Dr. Newman's opinion (Tr. 248-51).

On July 25, 2011, Plaintiff reported bilateral knee pain, but had normal muscle strength, stable gait, walked normally, and had no range of motion deficits (Tr. 435, 438). On July 26, 2011, Plaintiff underwent diagnostic imaging of both knees and patellas (Tr. 391). Plaintiff had a tiny spur in the right knee, and both knees showed minimal narrowing of the lateral patellofemoral joint space, and minimal-to-mild narrowing of the medial knee joint compartment, which was slightly more severe in the left knee (Tr. 392-93). Otherwise, Plaintiff had no swelling, deformity, prior injury, or surgeries (Tr. 392). On August 6, 2011, Plaintiff left the rehabilitation program to attend a family funeral and was discharged because he did not return by the specified date (Tr. 397, 954).

On November 9, 2011, Plaintiff appeared at a VA clinic to enter a residential program for substance abuse treatment (Tr. 944). He presented to receive medical clearance for CWT (Tr. 947). Plaintiff reported that he could lift up to 30 pounds, perform occupational bending, work 4-hour shifts, negotiate stairs, tolerate repetitive motions, and walk 2 to 5 hours per shift (Tr. 948). Plaintiff reported that he had back and wrist pain, but that it did not affect his ability to work (Tr. 948). Plaintiff received medical clearance for CWT (Tr. 948).

On November 14, 2011, Plaintiff received a standard mental health follow up (Tr. 932-33). A mental status examination was largely normal (Tr. 938). Plaintiff was oriented and cooperative and had normal memory and good concentration (Tr. 938).

On December 5, 2011, Plaintiff requested transition to the community and reported that he wanted to find a part-time job (Tr. 904-06). He said that his leisure activities included arts and crafts, drawings, paintings, and playing volleyball and horseshoes (Tr. 907).

One week later, on December 12, 2011, Plaintiff had a mental health treatment follow up (Tr. 896). Plaintiff reported that he wanted to work and said that he had

difficulty with lifting, bending, and climbing, but no trouble sitting, standing, or reaching/handling (Tr. 897-98).

On January 24, 2012, after not showing up for a January 20 appointment, Plaintiff was contacted by telephone. Plaintiff said that he was no longer interested in obtaining employment, and instead was pursuing SSI benefits (Tr. 887-88).

On March 8, 2012, Plaintiff again had a routine mental health follow up (Tr. 885-87). He was oriented, casually dressed, cooperative, goal-oriented, and he had limited insight and fair judgment (Tr. 885).

On May 30, 2012, a physical examination revealed that Plaintiff had normal muscle strength and tone (Tr. 884). He was neurologically intact (Tr. 884). Plaintiff reported that he occasionally took Tylenol for knee pain (Tr. 883).

By July 24, 2012, Plaintiff reported working in exchange for a place to stay (Tr. 878). Plaintiff continued receiving mental health treatment with largely normal mental status examinations (Tr. 866-884). For example, on December 13, 2012, Plaintiff was cooperative, spoke with a normal rate and volume, and had oriented thought process (Tr. 866). Plaintiff was oriented, had limited insight but fair judgment (Tr. 866).

## *IV. DISCUSSION*

The applicable standard of review is whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (internal quotations and citations omitted). Evidence that both supports and detracts from the Commissioner's decision should be considered, but a final administrative decision is not subject to reversal by a reviewing court merely because some evidence in the record may support a different conclusion. *See id.*

Questions of law, however, are reviewed de novo.  *See Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n. 2 (8th Cir. 1995).

### A. Consultative Physical Examination

Plaintiff first contends the ALJ should have developed the record by ordering a consultative physical examination. In particular, Plaintiff claims that "the evidence of lifting limitations and manipulative limitations was undeveloped" (Filing No. 19, at CM/ECF p. 6).

The ALJ found that Plaintiff "has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(b) with the following [exertional] limitations: he could occasionally crawl; he could frequently handle and finger; ..." (Tr. 20). In making this finding, the ALJ said he gave "significant weight to the opinion of State Disability Determination Service medical consultant Jerry Reed, MD who opined that the claimant could occasionally lift and carry fifty pounds; he could frequently lift and carry twenty five pounds; he could stand and/or walk six hours in an eight-hour workday; he could sit six hours in an eight-hour workday; he could frequently climb, balance, stoop, kneel, crouch, or crawling [*sic*][7] (Exhibit 4F/2, 3 [Tr. 235, 236])" (Tr. 23)[8]

---

[7] Dr. Reed actually limited Plaintiff to crawling "occasionally," and made the following notation: "Avoid crawling due to carpal tunnel" (Tr. 236). This is consistent with the ALJ's assessment of Plaintiff's RFC. However, the ALJ did not adopt Dr. Reed's unexplained opinions that Plaintiff is limited to frequent climbing, balancing, stooping, kneeling, and crouching.

[8] Dr. Reed's physical RFC assessment was completed on April 18, 2011 (Tr. 234-41). He listed a primary diagnosis of "Carpal Tunnel Syndrome" and a secondary diagnosis of "Mild DDD Cervical/Lumbar Spine" (Tr. 234) Dr. Reed questioned Plaintiff's credibility because although he had discomfort in his wrists and thumbs, he was performing farm chores such as mowing, fixing fences, and feeding livestock (Tr. 239). Dr. Reed also believed that Plaintiff's reported limitations on standing and

The ALJ found that "objective medical evidence of record supports the residual functional capacity detailed above" (Tr. 21). He stated that Plaintiff had "normal physical examinations and no neurological deficits" with respect to his complaints of "back pain, arthritis, carpal tunnel syndrome, and other symptoms" (Tr. 21).

Regarding Plaintiff's complaints of back pain, the ALJ noted four items: (1) "2010 x-rays scan of the lumbar spine showed only 'mild' degenerative changes and 'minimal' marginal spurring at the L2-L3 through L5-S1 levels (Exhibits 3F/2[9] [Tr. 221] and 4F[10] [Tr. 234-42])"; (2) "David Klopfenstein, MD reported that the 2010 x-rays did not reveal any fractures (Exhibit 12F/l[11] [Tr. 259])"; (3) In May of 2010,

---

sitting were inconsistent with his farming activities (Tr. 239). On September 12, 2011, Steven G. Higgins, M.D., reviewed Plaintiff's medical record and affirmed Dr. Reed's opinion (Tr. 245). He noted that Plaintiff's physical examination showed no range of motion deficits, no joint deformity, and no neurological abnormalities (Tr. 245). Dr. Higgins also noted that Plaintiff's motor and sensory functions were intact (Tr. 245). On September 26, 2011, Seymour Oberlander, M.D., reviewed the medical evidence and the medical opinions in the file (Tr. 247). Dr. Oberlander agreed with the prior medical opinions (Tr. 246). He noted medical records indicating that Plaintiff had a tender wrist with positive Phalen's and Tinel's signs, but no thenar atrophy (Tr. 246). Similarly, the notes showed that Plaintiff had a stable, unaided gait, and full range of motion (Tr. 246).

[9] This is an incorrect citation. Exhibit 3F is a psychiatric review technique form. Exhibit 12F/1 is a radiology report dated May 12, 2010, which showed "[m]ild degenerative changes throughout the lumbar spine," including "[m]inimal marginal spur ... at L2-L3 through L5-S1" and "mild facet degenerative change at L4-L5 and L5-S1" (Tr. 259).

[10] Exhibit 4F is Dr. Reed's physical RFC assessment form. Dr. Reed noted from his review of Plaintiff's medical records that "MER indicates mild DDD in the lumbar spine, mild DDD in the cervical spine, hx of carpal tunnel syndrome with tenderness to palpation of thumb saddle joints and pain with active ROM; wrists tender, no thenar wasting; Phalen's and Tinel's are positive" (Tr. 239).

[11] This appears to be the same radiology report as item (1).

-13-

treating physician, James Woell [*sic*], MD [*sic*] reported that the claimant was performing heavy lifting even as much as 250 pounds" [no citation][12]; and (4) "the record revealed that in July of 2011, the claimant did not exhibit tenderness to palpation throughout the lumbar spine (Exhibit 13F/21[13] [Tr 329])" (Tr. 21).

Similarly, the ALJ found that "the record does not reveal a leg impairment as severe as alleged" (Tr. 21). He stated: "For example, In July of 2011, radiologist John Mills, MD reported 'very minimal' narrowing of the medial knee joint bilaterally (Exhibit 15F/2 [Tr. 392]). Moreover, the record showed that the claimant ambulated with [*sic*] without the assistance of a wheelchair or walker and could walk up and down stairs and hills without any problems (Exhibits 3E [Tr. 186-190] and 12F/32 [Tr. 290])" (Tr. 21-22).

While finding that '[t]he record showed that the claimant has a history of carpal tunnel syndrome with tenderness to palpation along with positive Phalen and Tinel signs (Exhibits 12F/37, 38[14] [Tr. 295, 296] and 17F/76[15] [Tr. 941])," the ALJ thought

---

[12] James Woehl is a nurse practitioner at the VAMC. Plaintiff reported to Mr. Woehl "that he was doing some heavy lifting of some TUMS [*sic*] that weigh about 250 pounds, he did injure his back while doing this and still has low back pain" (Tr. 295).

[13] On March 22, 2011, Plaintiff complained of "rare but recurrent lower thoracic mid-line back pain, sharp almost stabbing pain about once per week, duration only about a minute each time" (Tr. 328). The treating physician, Philip E. McRill, M.D., noted that "the intermittent brief stabbing pain sounds like an individual cutaneous nerve being damaged" (Tr. 329). On examination, Plaintiff's "[b]ack show[ed] no tenderness to palpation" (Tr. 329).

[14] This is an incorrect citation. Dr. McRill's examination of Plaintiff on December 22, 2010, revealed: "Hands show tenderness to palpation of thumb saddle joints and pain with active ROM of same joints. Wrists are tender to palpation. Phalen's and Tinel's signs are positive. There is no thenar wasting." (Tr. 278)

[15] This is also an incorrect citation.

-14-

that Plaintiff's "allegation of hand severity is questionable since his daily activities are inconsistent with his alleged hand pain" (Tr. 22). The ALJ found it significant that Plaintiff "feeds the livestock 3-4 times per day, gardens, and mows the lawn for two hours, does crafts, fixes fences, hauls hay (Exhibit 3E [Tr. 186-190] and Hearing testimony [Tr. 39-51])" (Tr. 22).[16] Finding "that these activities are inconsistent with [Plaintiff's] alleged severe carpal tunnel condition," the ALJ concluded that "a restriction to frequent handling and fingering is appropriate " (Tr. 22).

The ALJ then added: "However, Dr. Reed opined that the claimant should avoid very heavy lifting and rapid wrist motion" (Tr. 23). Dr. Reed's notes show he included this restriction because Plaintiff has a history "of carpal tunnel bilaterally with wrist and thumb tenderness" (Tr. 235). Dr. Reed further noted that such condition "does not affect manipulative ability unless motions are frequent and repetitive" (Tr. 237), but this notation was not mentioned in the ALJ's decision. Confusingly, Dr. Reed made this notation after checking a box on the RFC assessment form to indicate that no manipulative limitations were established (Tr. 237).

Plaintiff interprets Dr. Reed's notation to mean that he can have "no frequent motions" involving the wrists, and argues that such a restriction is inconsistent with the ALJ's assessment that he is capable of "frequent" handling and fingering. (*See* Filing No. 19, at CM/ECF p. 13 (contending that "Dr. Reed translated the limitation

---

[16] Plaintiff completed a "daily activities and symptoms report" form on April 4, 2011 (Tr. 186-90). Plaintiff wrote that in a typical day he feeds cattle, horses, and goats three or four times per day (Tr. 186). He reported that, except for dishes, he was capable of performing most chores (Tr. 186). In the summer, he mowed the lawn for up to two hours and worked in the garden (Tr. 186). He fixed fences and hauled hay (Tr. 187). Plaintiff reported difficulty walking and standing, with specific difficulty walking up stairs, and said he could not lift things above his head (Tr. 187, 189).

[regarding "rapid wrist movement"] to a vocational term—no frequent motions")).[17] The terms "frequent" and "rapid" are not synonymous, however.

"Frequent" means "occurring from one-third to two-thirds of the time." Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *6 (SSA 1983); *see also* Dr. Reed's RFC assessment, at p. 1 (Tr. 234). "Rapid" is not a defined term in Social Security parlance, but by common understanding it denotes "having a fast rate" or "moving quickly." *See* Merriam-Webster online dictionary.[18] Contrary to Plaintiff's argument, the term "rapid" does not indicate how often an activity occurs during a workday. "Repetitive" also is not defined in the regulations, but the term generally means "happening again and again" or "repeated many times." *See id*.[19] While Dr. Reed's opinion suggests that Plaintiff should avoid both rapid wrist movements and frequent, repetitive wrist movements, neither limitation is inconsistent with frequent handling and fingering. *Cf. Young v. Astrue*, 702 F.3d 489, 492 (8th Cir. 2013) ("While the Commissioner concedes Young's past relevant work as a factory packer and assembler requires 'constant and frequent reaching, handling, and fingering,' those requirements do not necessarily entail rapid and repetitive movement of the right wrist or otherwise exceed Young's documented limitations."). Plaintiff does not argue that the ALJ committed reversible error by not including specific limitations on wrist movements in his RFC assessment.

The ALJ found that Plaintiff's severe physical impairments include arthritis of the wrists, carpal tunnel syndrome, degenerative disc disease, COPD, gout, and

---

[17] Plaintiff states Dr. Reed "opined that Little should not perform frequent *or* repetitive manipulative motions because of his carpal tunnel syndrome" (Filing No. 19, at CM/ECF p. 2 (emphasis supplied)). Dr. Reed's notation actually says "frequent *and* repetitive" motions (Tr. 237 (emphasis supplied)).

[18] Available at http://www.merriam-webster.com/dictionary/rapid.

[19] Available at http://www.merriam-webster.com/dictionary/repetitive.

diabetes mellitus type II. The only additional physical condition Plaintiff listed in his application for SSI benefits was macular degeneration, but he does not claim the ALJ erred by not considering this alleged impairment. While Plaintiff cites to a page of his VA records which lists various physical complaints he has had since at least May 2000 (Tr. 879),[20] the evidence does not show that these conditions continued to exist

---

[20] This appears to be a computer-generated list from the VAMC, but the record does not contain corresponding documents for all of the entries. Plaintiff states that "VAMC reports listed conditions including pain in joint involving lower leg, idiopathic peripheral neuropathy, anemia, COPD, history of positive PPD, shortness of breath, rotator cuff tear, back/lumbar pain, epicondylitis, polyarthralgia, arthralgia, hypothyroidism, and diabetes mellitus II" (Filing No. 17, at CM/ECF p. 21). "COPD" and "diabetes mellitus II" were recognized by the ALJ as severe impairments. The diagnoses of "arthralgia" and "polyarthralgia," which supposedly were made in November and December 2004, presumably refer to the arthritis in both of Plaintiff's wrists, which the ALJ also considered to be a severe impairment. Plaintiff reported "pain in joint involving lower leg" on July 25, 2011, but on examination he had normal muscle strength, walked normally, and had no range of motion deficits (Tr.438). Diagnostic imaging of both knees showed only minimal narrowing of the joint spaces (Tr. 392). The "idiopathic peripheral neuropathy" notation was made on March 22, 2011, when Plaintiff reported to Dr. McRill that he experienced "lower thoracic mid-line back pain" about once a week for one minute each time (Tr. 320, 328). Anemia was diagnosed on December 2, 2009, and Plaintiff was prescribed ferrous sulfate for iron replacement (Tr. 447, 448). This does not appear to be a continuing problem. Plaintiff reported that the rotator cuff tear occurred in the mid-1980s (Tr. 212). He has been examined numerous times since then. The "back/lumbar pain" entry supposedly was made on May 28, 2008, but this complaint is not noted in a medical history that was completed on that date (Tr. 522), nor did a physical exam the following day reveal any back problems (Tr. 518). The diagnosis of "epicondylitis" supposedly was made on May 17, 2006, but this musculoskeletal disorder does not otherwise appear in the medical records. It was not listed as a medical condition on January 19, 2007 (Tr. 534), or afterwards. The "shortness of breath" entry supposedly was made on May 2, 2005, but it does not appear in the medical records. The "hypothyroidism" entry supposedly was made on October 21, 2003. As of June 15, 2004, Plaintiff was taking 0.1mg of levothyroxine to treat the condition (Tr. 585). "History of positive IPPD as a child" was noted on July 21, 2003 (Tr. 646), but there is no other evidence Plaintiff has tuberculosis.

as of January 2011, when Plaintiff applied for SSI benefits, or, if they did exist, that they imposed any functional limitations.

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Lott v. Colvin*, 772 F.3d 546, 549 (8th Cir. 2014) (quoting *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)). "[I]t may be reversible error for an ALJ not to order a consultative examination when, without such an examination, [s]he cannot make an informed choice." *Id.* (quoting *Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986) (per curiam)); *see also* 20 C.F.R. § 416.917 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests.").

"However, '[t]he ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled.'" *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quoting *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994)). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011).

As detailed above, the record in this case contains a substantial amount of information about Plaintiff's impairments, from which the ALJ was able to make an informed assessment of Plaintiff's residual functional capacity. "The ALJ was not required to supplement the record ... with a consultative examination, because no 'crucial issue' in the record required development. *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)).

-18-

### B. Nevland v. Apfel

Plaintiff next argues that even if the record contains sufficient information about the nature and extent of his physical impairments, a consultative examination still was necessary in order to obtain a medical opinion discussing his functional limitations.[21] This argument is based on the Eighth Circuits' decision in *Nevland v. Apfel*, 204 F.3d 853 (8th Cir. 2000), which held that the opinions of non-examining state agency medical consultants ordinarily do not constitute substantial evidence at step five of the sequential evaluation process.[22] The Court of Appeals stated:

---

[21] The ALJ specifically noted "that no treating or examining physicians submitted medical source statements limiting the claimant's ability to perform work activities on a function-by-function basis" (Tr. 24). "Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis. Adjudicators are generally required to request that acceptable medical sources provide these statements with their medical reports." SSR 96-5p, 1996 WL 374183, at *4 (SSA July 2, 1996) (footnote omitted). At the hearing, the ALJ questioned Plaintiff's attorney whether "we have any medical opinion from the VA or any of the treating doctors" (Tr. at 37). Counsel responded that he "was not able to get one" but indicated he would "follow up on this and see if we could get something from the physical side of things from the VA" (Tr. at 38). The ALJ left the record open for two weeks for this purpose, telling Plaintiff's counsel that "if you can get a doctor to do it, that could kind of probably tell us exactly what's going on with Mr. Little as far as his functional limitations" (Tr. at 58-59). No further evidence was submitted.

[22] "*Nevland* does not preclude the ALJ's reliance on a reviewing physician's report at step four when the burden is on the claimant to establish an inability to do past relevant work." *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007). *See, e.g., Musial v. Astrue*, 347 Fed.Appx. 260, 2009 WL 3172145 (8th Cir. 2009) (in finding that claimant could perform past relevant work, ALJ could credit opinion of non-examining state agency medical consultant where claimant did not provide medical evidence of specific functional restrictions imposed by her treating doctors that conflicted with consultant's RFC analysis).

-19-

In the case at bar, there is no *medical* evidence about how Nevland's impairments affect his ability to function now. The ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of Nevland's RFC. In our opinion, this does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole. *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999).[23] Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. *Id.* In our opinion, the ALJ should have sought such an opinion from Nevland's treating physicians or, in the alternative, ordered consultative examinations, including psychiatric and/or psychological evaluations to assess Nevland's mental and physical residual functional capacity. As this Court said in *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975): "An administrative law judge may not draw upon his own inferences from medical reports. *See Landess v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir. 1974); *Willem v. Richardson*, 490 F.2d 1247, 1248–49 n. 3 (8th Cir. 1974)."

*Id.* at 858 (emphasis in original); *see also Strongson v. Barnhart*, 361 F.3d 1066, 1071-72 (8th Cir. 2004) ("[T]he ALJ's duty to develop the record fully and fairly ... includes the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue.").

"*Nevland*, however, does not compel remand in every case in which the administrative record lacks a treating doctor's opinion." *Hattig v. Colvin*, No. C 12-4092-MWB, 2013 WL 6511866, at *10 (N.D.Iowa Dec. 12, 2013). "[A]n ALJ is

---

[23] In *Jenkins*, the ALJ's RFC finding was based solely on a non-treating physician's assessment, there was "no other evidence in the record to support the ALJ's finding besides the non-treating physician's assessment," and additional medical reports by a treating rheumatologist submitted after the ALJ's hearing showed that the claimant had "less [RFC] than the ALJ concluded." 196 F.3d at 924-25.

-20-

permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994); *see also Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) ("Even though the opinion of a [non-examining] consulting physician alone does not generally constitute substantial evidence, *see* [*Lauer v. Apfel*, 245 F.3d 700, 706 (8th Cir. 2001)], the ALJ did not rely solely on the opinion of the consulting physician, but also conducted an independent review of the medical evidence.").

"The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). "A claimant's records need not explicitly discuss work-related limitations, as long as the records describe the claimant's 'functional limitations with sufficient generalized clarity to allow for an understanding of how those limitations function in a work environment.'" *Figgins v. Colvin*, No. C 13-3022-MWB, 2014 WL 1686821, at *9 (N.D.Iowa Apr. 29, 2014) (quoting *Cox v. Astrue*, 495 F.3d 614, 620 n. 6 (8th Cir. 2007)).

The Commissioner states that "[t]he record contained evidence from Plaintiff's treating physicians regarding his abilities, rendering *Nevland* inapposite. For example, notes from the VA show that a medical consultation established that Plaintiff was capable of lifting 50 pounds, performing occupational bending, standing for two hours, working an eight-hour shift, operating hand tools or equipment, and negotiating stairs (Tr. 463). The consultation also showed that Plaintiff was 'mentally and physically capable of operating woodshop power tools: table saw, jig saw, jointer, radial arm saw, router, drill press, disc and belt sanders, band saw, portable power tools, grinder, riding mower, push mower, weed eater, lawn sweeper, hand blower, Bobcat, snow blower' (Tr. 463)." (Filing No. 18, at CM/ECF pp. 20-21). The referenced document is a "vocational rehabilitation note" signed by a family nurse

-21-

practitioner, Aleen M. Golis, on September 15, 2009. Plaintiff was approved for work with no restrictions (Tr. 464).[24]

Subsequently, in May 2010, Plaintiff complained of "increasing numbness in his hands" (Tr. 295) and "increasing pain in both wrists" (Tr. 278), but he was able to work with a simple wrist support (Tr. 278). Although Plaintiff reported injuring his back while lifting 250 pounds, he had full range of motion (Tr. 295-296). X-rays of Plaintiff's cervical and lumbar spine showed only mild degenerative changes, and mild calcification (Tr. 259-260).

Several physical exams in July 2011 revealed that Plaintiff had symmetrical muscle strength against resistance, no range of motion deficits, and normal sensory function (Tr. 403, 387, 438). Plaintiff reported early morning stiffness of the metacarpophalangeal joint, but said Tylenol helped his symptoms (Tr. 402). Plaintiff stated in a work evaluation that while he had hand and wrist pain, he was capable of lifting 30 pounds, performing occupational bending, working an 8-hour shift, walking 2-5 hours per shift, negotiating stairs, and tolerating repetitive motions (Tr. 367-368).

Plaintiff provided similar answers in November 2011, except he indicated that he could only work a 4-hour shift (Tr. 948). Plaintiff reported that he had back and wrist pain, but that it did not affect his ability to work (Tr. 948). He received medical

---

[24] Under the Social Security regulations, nurse practitioners are not considered "acceptable medical sources" who can provide evidence to establish the existence of a medically determinable impairment, *see* 20 C.F.R. §§ 404.1513(a), but as "other medical sources" their opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p, 2006 WL 2329939, *3 (SSA Aug. 9, 2006). "Opinions from 'other medical sources' may reflect the source's judgment about some of the same issues addressed in medical opinions from 'acceptable medical sources,' including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *5.

clearance for CWT (Tr. 948). In December 2011, Plaintiff reported that he wanted to work and said that he had difficulty with lifting and bending "at times with my back problem," and "some issues with climbing," but no trouble sitting, standing, or reaching/handling (Tr. 897-898). A May 2012 physical exam showed that Plaintiff had normal muscle strength and tone (Tr. 884). Plaintiff said he was working as farm laborer, and only reported taking "occasional Tylenol for knee pain, but not regularly" (Tr. 883).

Unless there is some showing by the claimant that he or she "was prejudiced or treated unfairly by how the ALJ did or did not develop the record," remand is not appropriate. *Onstad v. Shalala*, 999 F.2d 1232, 1234 (8th Cir.1993) (citing *Phelan v. Bowen*, 846 F.2d 478, 481 (8th Cir. 1988)). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008) (citing *Battles v. Shalala*, 36 F.3d 43, 45 (8th Cir. 1994)).

Although it would have been preferable to have a medical source statement from one of Plaintiff's treating physicians at the VA, the existing record provides a sufficient basis for understanding how Plaintiff's impairments affect his ability to function in the workplace. Because Plaintiff has not shown that he was prejudiced by the lack of a consultative physical exam, remand for the purpose of obtaining such an exam is not appropriate.

### C. Vocational Expert

Finally, Plaintiff argues that the vocational expert's testimony does not constitute substantial evidence in support of the ALJ's finding at step because (1) "ability to perform light unskilled jobs was immaterial" and (2) "the requirements of the jobs named by the VE did not match the hypothetical" (Filing No. 17, at CM/ECF p. 25).

-23-

Rule 202.04 of the Medical Vocational Guidelines, ("Grids"), 20 C.F.R., Part 404, Subpart P, Appendix 2, directs a finding of disability where a claimant of advanced age[25] is limited by exertional impairments to doing light work and, although possessing at least a high school diploma, has a history of unskilled work. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 416.967(b).

By contrast, a claimant of advanced age with a high school education who is able to perform a full range of medium work is considered to be "not disabled" under Rule 203.14,[26] even though he has only unskilled work experience. "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 416.967(c). "A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds.... Use of the arms and hands is necessary to grasp, hold, and turn objects, ..." SSR 83-10, 1983 WL 31251, at *6 (SSA 1983).

The ALJ stated that if Plaintiff had the residual functional capacity to perform the full range of medium work, a finding of "not disabled" would be directed by the Grids,[27] but he recognized that Plaintiff's "ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations" (Tr.

---

[25] The ALJ erroneously found that Plaintiff was "closely approaching advanced age" on the date the application was filed (Tr. 24). In point of fact, Plaintiff had already reached "advanced age." See 20 C.F.R. § 416.963(c) ("We consider that at advanced age (age 55 or older), age significantly affects a person's ability to adjust to other work.").

[26] The ALJ erroneously referenced Rule 203.21 (Tr. 25), which applies to an individual "closely approaching advanced age."

[27] As discussed above, the ALJ erred by referencing Rule 203.21 instead of 203.14, but the error was harmless.

-24-

25). "To determine the extent to which these limitations erode the unskilled medium occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with [Plaintiff's] age, education, work experience, and residual functional capacity" (Tr. 25). "The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as" bagger, hand packer, food service worker, price marker, fast food worker, and night office cleaner (Tr. 25).[28]

The final three jobs are classified as "light unskilled" work. Plaintiff contends these jobs should not be considered because if he were limited to performing light unskilled work, a finding of disability would be required by Rule 202.04. Completely missing the point of Plaintiff's argument about the Grids, the Commissioner responds that "Plaintiff's position that an individual capable of performing medium work can only perform medium work, and not light work, has no support in the regulations or case law" (Filing No. 18, at CM/ECF p. 24). She asserts that "the regulations conclusively refute Plaintiff's position" because "[t]he ability to perform medium

---

[28] The job information is displayed in table format in the ALJ's decision:

| Job | D.O.T. Nmnber | Exertion Level | Skill Level (SVP) | # of Jobs Available Locally[1] | # of Jobs Available Nationally |
|---|---|---|---|---|---|
| Bagger | 920.687-014 | Medium | Unskilled | 724 | 120,000 |
| Hand Packer | 920.587-018 | Medium | Unskilled | 250 | 42,000; |
| Food Service Worker | 319.677-014 | Medium | Unskilled | 306 | 26,000 |
| Price Marker | 209.587-034 | Light | Unskilled | 1,000 | 100,000 |
| Fast Food Worker | 311.472-010 | Light | Unskilled | 7,000 | 100,000 |
| Night Office Cleaner | 323.687-014 | Light | Unskilled | 820 | 110,000 |

(Tr. 25) "Locally" is defined as the State of Nebraska (Tr. 25, n. 1).

-25-

work "includes the functional capacity to perform sedentary, light, and medium work" (*id.*, quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 203.00(a)).

The Medical-Vocational Rules "reflect the analysis of the various vocational factors (*i.e.*, age, education, and work experience) in combination with the individual's residual functional capacity (used to determine his or her maximum sustained work capability for sedentary, light, medium, heavy, or very heavy work) in evaluating the individual's ability to engage in substantial gainful activity in other than his or her vocationally relevant past work. Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a). "Where any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled. In any instance where a rule does not apply, full consideration must be given to all of the relevant facts of the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations." *Id.*

"The existence of jobs in the national economy is reflected in the 'Decisions' shown in the rules; i.e., in promulgating the rules, administrative notice has been taken of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels (sedentary, light, medium, heavy, and very heavy) as supported by the 'Dictionary of Occupational Titles' and the 'Occupational Outlook Handbook,' published by the Department of Labor; the 'County Business Patterns' and 'Census Surveys' published by the Bureau of the Census; and occupational surveys of light and sedentary jobs prepared for the Social Security Administration by various State employment agencies. Thus, when all factors coincide with the criteria of a rule, the existence of such jobs is established. However, the existence of such jobs for individuals whose remaining functional capacity or other factors do not coincide with the criteria of a rule must be further considered in terms of what kinds

of jobs or types of work may be either additionally indicated or precluded." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(b).

"The functional capacity to perform a full range of light work includes the functional capacity to perform sedentary as well as light work. Approximately 1,600 separate sedentary and light unskilled occupations can be identified in eight broad occupational categories, each occupation representing numerous jobs in the national economy." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.00(a). "The functional capacity to perform a wide or full range of light work represents substantial work capability compatible with making a work adjustment to substantial numbers of unskilled jobs and, thus, generally provides sufficient occupational mobility even for severely impaired individuals who are not of advanced age and have sufficient educational competencies for unskilled work." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.00(b). "However, for individuals of advanced age who can no longer perform vocationally relevant past work and who have a history of unskilled work experience, ... the limitations in vocational adaptability represented by functional restriction to light work warrant a finding of disabled. Ordinarily, even a high school education or more which was completed in the remote past will have little positive impact on effecting a vocational adjustment unless relevant work experience reflects use of such education." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 202.00(c).

"The functional capacity to perform medium work includes the functional capacity to perform sedentary, light, and medium work. Approximately 2,500 separate sedentary, light, and medium occupations can be identified, each occupation representing numerous jobs in the national economy which do not require skills or previous experience ...." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 203.00(a). "The functional capacity to perform medium work represents such substantial work capability at even the unskilled level that a finding of disabled is ordinarily not warranted in cases where a severely impaired person retains the functional capacity to perform medium work. Even the adversity of advanced age (55 or over) and a work history of unskilled work may be offset by the substantial work capability represented

-27-

by the functional capacity to perform medium work." 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 203.00(b).

If, as in this case, a claimant's "exertional level falls between two rules which direct opposite conclusions, *i.e.*, 'Not disabled' at the higher exertional level and 'Disabled' at the lower exertional level," the ALJ is directed to consider the following:

> a. An exertional capacity that is only slightly reduced in terms of the regulatory criteria could indicate a sufficient remaining occupational base to satisfy the minimal requirements for a finding of "Not disabled."

> b. On the other hand, if the exertional capacity is significantly reduced in terms of the regulatory definition, it could indicate little more than the occupational base for the lower rule and could justify a finding of "Disabled."

> c. In situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere "in the middle" in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability. Accordingly, VS[29] assistance is advisable for these types of cases.

SSR 83-12, 1983 WL 31253, at *2-3 (SSA 1983).[30]

---

[29] A "VS" is a vocational specialist, who provides evidence to a disability determination services adjudicator, as distinguished from a VE, who provides evidence at a hearing before an ALJ. *See* SSR 00-4p, 2000 WL 1898704, at *1 (SSA Dec. 4, 2000).

[30] The ALJ must also consider the effect of any non-exertional limitations that are attributable to physical or mental impairments:

> In reaching judgments as to the sufficiency of the remaining exertional job base (approximately 2,500 unskilled medium, light, and sedentary occupations, approximately 1,600 unskilled light and sedentary occupations, and approximately 200 unskilled sedentary

The VE's testimony indicating that a hypothetical individual with Plaintiff's RFC could perform certain light duty jobs does not address the pertinent question of whether such an individual could also find work at the medium exertion level. Unless a significant number of medium-duty jobs exist, such an individual is presumptively disabled under the Grids. Thus, the VE's testimony regarding the price marker, fast food worker, and night office cleaner jobs is irrelevant and should not have been considered by the ALJ. *See, e.g., Carson v. Barnhart,* 140 Fed.Appx. 29, 39, 2005 WL 1649188, *7 (10th Cir. 2005) (sedentary jobs identified by VE did not support ALJ's finding that claimant was not disabled where the Grids provide that a person closely approaching advanced age, with twelfth grade education and no transferable skills, is disabled even if he can perform full range unskilled sedentary work).

It appears the VE also erred in testifying that the a hypothetical individual with Plaintiff's RFC could perform the job of "hand packer." According to the Dictionary of Occupational Titles (DOT), a hand packager (DOT #920.587-018) is engaged in handling and fingering activities "constantly" (*i.e.*, two-thirds or more of time) (Filing

---

occupations), there are three possible situations to consider:

1. Where it is clear that the additional limitation or restriction has very little effect on the exertional occupational base, the conclusion directed by the appropriate rule in Tables No. 1, 2, or 3 would not be affected.

2. Where it is clear that additional limitations or restrictions have significantly eroded the exertional job base set by the exertional limitations alone, the remaining portion of the job base will guide the decision.

3. Where the adjudicator does not have a clear understanding of the effects of additional limitations on the job base, the services of a VS will be necessary.

SSR 83-14, 1983 WL 31254, at *6 (SSA 1983).

-29-

No. 17-3, at CM/ECF p. 3). The ALJ limited Plaintiff to handling and fingering "frequently" (*i.e.*, between one-third and two-thirds of the time). Although the ALJ asked the VE whether there was any inconsistency between his testimony and the DOT, and was assured there was not (Tr. 58), this exchange does not eliminate the evidentiary problem.  As explained recently in *Moore v. Colvin*, 769 F.3d 987, 989-90 (8th Cir. 2014):

> Under Social Security Ruling (SSR) 00-4p, the ALJ must "ask about any possible conflict" between VE evidence and "information provided in the DOT." In this case, the ALJ satisfied this requirement by asking the VE to confirm the consistency of her testimony. However, the responsibilities of the ALJ do not end there. If there is an "apparent unresolved conflict" between VE testimony and the DOT, the ALJ must "elicit a reasonable explanation for the conflict" and "resolve the conflict by determining if the explanation given [by the expert] provides a basis for relying on the [VE] testimony rather than on the DOT information." SSR 00-4p, 2000 WL 1898704, at *2-4 (Dec. 4, 2000). The ALJ is not absolved of this duty merely because the VE responds "yes" when asked if her testimony is consistent with the DOT. *See Kemp v. Colvin*, 743 F.3d 630, 633 (8th Cir.2014) (remanding denial of benefits because "the record does not reflect whether the VE or the ALJ even recognized the possible conflict between the hypothetical" and the recommended job).

The VE's testimony regarding the "food service worker" job also is inconsistent with the DOT description. The actual occupational title is "hospital food-service worker" (DOT #319.677-014), and the job involves "prepar[ing] and deliver[ing] food trays to hospital patients" (Filing No. 17-2, at CM/ECF p. 1). Understandably, the job involves "significant" serving activities (Filing No. 17-2, at CM/ECF p. 2). The VE seems to have been confused about the position, as he testified that some "food service workers [could be] out on the floor just picking up trash and doing a lot of janitorial type of work ... [s]o they wouldn't have anything to do with the general public" (Tr. 55). Plaintiff's RFC requires that he have only occasional interaction with the general public. The Commissioner effectively concedes that Plaintiff could not perform the jobs of hand packager and hospital food-service worker, but claims "substantial

-30-

evidence still supports the ALJ's determination that Plaintiff could perform the job of a bagger" (Filing No. 18, at CM/ECF p. 25).

A bagger (DOT #920.687-014) "[b]ags groceries at grocery store" (Filing No. 17-1, at CM/ECF p. 1).[31] Plaintiff claims he is unable to perform this work because he has difficulty stooping and reaching, which are frequent activities for a bagger (*see* Filing No. 17-1, at CM/ECF p. 2). He states that "the ALJ's 'function-by-function' RFC failed to address stooping and reaching" (Filing No. 17, at CM/ECF p. 25).

"The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, ...."[32] Only after that may RFC be expressed in terms of the exertional levels of

---

[31] More specifically, a bagger's duties include the following activities: "Packs grocery items in sacks or cartons, arranging heavy and bulky items at bottom of sack or carton. Verifies price of grocery item in question against price of items on stock shelf, upon request. Carries packed sacks, or places sacks in grocery cart, and pushes cart to customer's vehicle, upon request. Places groceries into customer's vehicle. Collects shopping carts from parking lot and surrounding areas and returns carts to store. Replaces cleaning and packing supplies used at grocery checkout counter. Returns grocery items left at checkout counter to specified stock shelves. Cleans work area and carries empty bottles and trash to storeroom. May price and place grocery articles on shelves. May assist in unloading delivery trucks." (Filing No. 17-1, at CM/ECF p. 1) Although Plaintiff argues that a bagger would need to have more than occasional contact with the general public or coworkers, the job description does not compel this conclusion. In fact, the DOT says that the need for taking instructions or helping people is "not significant" (Filing No. 17-1, at CM/ECF p. 2). Because there is no "apparent unresolved conflict" between the VE's testimony and the DOT, *see Moore*, 769 F.3d at 989-90, the ALJ was entitled to accept the VE's testimony that an individual with Plaintiff's RFC can perform the job of bagger.

[32] With respect to physical activities, the regulations state that "[a] limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching),

work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1 (SSA July 2, 1996). "Without a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." Id., at *4.

Although the ALJ did not specifically discuss whether Plaintiff is limited in his ability to reach, the evidence does not support a finding that he cannot reach at least frequently. Indeed, Dr. Reed opined that Plaintiff has no limitations reaching (Tr. 237). Plaintiff cites no evidence to the contrary, but merely asserts that "he alleged back pain and a shoulder impairment" (Filing No. 17, at CM/ECF p. 24). In December 2011, Plaintiff reported he had no difficulty reaching (Tr. 898).

The ALJ correctly noted Dr. Reed's opinion that Plaintiff can frequently stoop (Tr. 23), but then did not include such a limitation in the RFC assessment. The ALJ erred by failing to provide any explanation for this omission. *See* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). The error was harmless, however, because even if Plaintiff is limited to frequent stooping, this is not inconsistent with job requirements for a bagger. The evidence would not support a finding that Plaintiff is limited to occasional stooping. In December 2011, Plaintiff reported he had difficulty bending "at times with my back problem" (Tr. 898), but on several other occasions he claimed to be capable of occupational bending (Tr. 367, 463, 948). Repeated physical examinations failed to reveal any range of motion deficits (Tr. 296, 403, 438).

---

may reduce [the claimant's] ability to do past work and other work." 20 C.F.R. § 416.945(b).

"In order to support a finding that [a claimant] is not disabled at the fifth step of the sequential evaluation process, [the Commissioner is] responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the clamant] can do, given [his or her] residual functional capacity and vocational factors. 20 C.F.R. § 416.960(c)(2). "[W]ork exists in the national economy when it exists in significant numbers either in the region where [the claimant] live[s] or in several other regions of the country." 20 C.F.R. § 416.966(a).

According to the VE, there are 724 grocery store bagger jobs available in Nebraska and 120,000 nationally. This exceeds levels the Eighth Circuit has considered sufficient to constitute a "significant number." *See*, *e.g.*, *Weiler v. Apfel*, *179 F.3d 1107, 1110-11 (8th Cir. 1999)* (32,000 surveillance monitor jobs nationwide); *Johnson v. Chater*, 108 F.3d 178, 180 & n. 3 (8th Cir. 1997) (200 telemarketing jobs in state and 10,000 nationally); *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir.1997) (340 clerking jobs, plus indeterminate number of receptionist and cashiering jobs in state); *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997) (650 surveillance monitoring, addressing, or document preparation jobs in state and 30,000 nationwide); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (500 sedentary security jobs in region).

While not without its problems, the VE's testimony in response to the ALJ's hypothetical is substantial evidence supporting the ALJ's conclusion that there are a significant number of jobs in the economy that Plaintiff can perform.

### V. Conclusion

For the reasons explained above, I find the ALJ's decision is supported by substantial evidence on the record as a whole and is not contrary to law.

Accordingly,

-33-

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).  Final judgment will be entered by separate document.

May 14, 2015.                        BY THE COURT:

                                     s/ Richard G. Kopf
                                     Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.